ALLEN H. STEM, Individually and as Surviving Partner of the Firm of Reed & Stem, plaintiff, v. WHITNEY WARREN and CHARLES D. WETMORE, Composing the Firm of Warren & Wetmore, and WILLIAM J. REED, as Executor under the Last Will and Testament of Charles A. Reed, Deceased, Defendants.

(Supreme Court, New York Special Term, July, 1916.)

Partnership — dissolution of — accounting — contracts — what is partnership asset.

A purer and more elevated morality is demanded of partners than the common morality of the trade, and the standard by which they are tried in a court of equity is far higher than the ordinary standards of business; questionable dealing of any kind will not be tolerated.

Upon the dissolution of a partnership by reason of the death of one of its members it is the duty of the surviving partner to wind up the affairs of the firm for the benefit of the partnership; such partnership though legally dissolved continues the purpose of collecting and distributing its assets and performing antecedent obligations; the dissolution has respect only to the future, as to everything past the partnership continues until all pre-existing matters are wound up.

Where a partnership is dissolved by reason of the death of one of its members the surviving partners are neither deprived of the power to perform existing contracts on behalf of the firm nor relieved of the duty of having them performed.

Two firms of architects, R. & S., and W. & W., entered into a partnership for the special purpose of accepting employment in connection with the designing and erecting of the Grand Central Terminal Station in the city of New York and other buildings to be constructed in connection therewith, the com-

pensation for which was to be fixed upon the basis of the entire amount of work done. R. was made executive head of the new partnership and the work for which it was organized was begun. About seven years later R. died leaving the work unfinished and shortly after the railroad company canceled the contract with the new partnership and signed a new one with W. & W. giving them the work in question. S. and the executor of R., upon a claim that the cancellation of the original contract and the substitution of W. & W. was brought about at the suggestion of the latter for the purpose of excluding plaintiff and the estate of R. from the profits of the work which had been assigned to the new partnership and upon which they were then working, brought an action for an accounting. Held, that the organization which the new partnership had built up was a partnership asset of which W. & W. would deprive plaintiff and the estate of R. if they were not compelled to account for the profits which they had been able to make through its use.

That the cancellation of the old contract and the making of the new one having been brought about by the actions and the attitude of W. & W. they violated their legal obligation as surviving partners, were guilty of a breach of trust of the partnership relation, and should be required to account accordingly.

ACTION for an accounting.

Harold Swain, for plaintiff.

Gerald Hull Gray, for defendants Warren & Wetmore.

Strang & Taylor (Arthur I. Strang, of counsel), for William J. Reed, executor.

DELEHANTY, J. Action for an accounting. On February 8, 1904, two firms of architects — Reed & Stem and Warren & Wetmore — entered into a partnership, referred to herein as the Associated Architects, for the special purpose of accepting employment in connection with the designing and erection of the Grand Central Terminal Station in the city of New

York and other buildings that were to be constructed in connection therewith. Charles A. Reed, of Reed & Stem, was made executive head of the association, and the work for which it was organized was undertaken. On November 12, 1911, Reed died leaving the work unfinished. Shortly thereafter the railroad company canceled the contract with the Associated Architects and signed a new one with Warren & Wetmore, giving them the work in question. The plaintiff, Stem, and William J. Reed, executor of the estate of Charles A. Reed, claim that the cancellation of the original contract and the substitution of Warren & Wetmore were brought about at the suggestion of the latter for the purpose of excluding the plaintiff and the Reed estate from the profits of the work which had been assigned to the Associated Architects and upon which they were then working as uncompleted business. The question presented for decision is whether the plaintiff is entitled to an accounting, and, if so, what is to be the scope thereof. A consideration of the rule of law governing the relationship and conduct of partners toward one another is of material assistance in working out the rights of the parties hereto. In their dealings with each other partners occupy a position of trust and confidence, and the authorities unanimously agree that there is scarcely any relation in life which calls for more absolute good faith than the relationship of partners. Each is the general agent of the firm with power to affect the interests of all. Hence the law has thrown a protection around the partnership as such by requiring that every advantage which an individual can gain in the business must inure to the benefit of the firm. A purer and more elevated morality is demanded of partners than the common morality of the trade, and the standard by which they are tried in a court of equity is far higher than the ordinary

standards of business. Questionable dealing of any
kind will not be tolerated. Narrow views resulting in
the preference of one partner at the expense of the
firm must yield to broad principles of fair dealing and
highmindedness. The Court of Apeals of this state in
the recent case of *Selwyn & Co.* v. *Waller,* 212 N. Y. 507,
511, where the question presented lay on the boundary
between the domain of law and that of ethics, said in
reference to the duties of parties about to engage in
a joint adventure, whether as parties *inter sese* or not:
" It is now well settled that persons in, or about to
assume, that relation owe to each other the utmost good
faith and the most scrupulous honesty. (*Getty* v. *Dev-
lin,* 54 N. Y. 403; *Mitchell* v. *Reed,* 61 N. Y. 123; *Kim-
berly* v. *Arms,* 129 U. S. 512.) They do not deal at
arms' length." It was also stated in the *Selwyn* case
that the failure to conform to the high standards of
honesty and good faith which the law exacts from one
partner or coadventurer towards the others is a breach
of a legal duty. The court there also said: " In our
opinion that standard should not be lowered by putting
dubious conduct outside of the domain of law." When
the case was in the Appellate Division of this depart-
ment (160 App. Div. 725), Mr. Justice Laughlin wrote
(p. 734): " The wisdom of ages has developed
a wholesome rule of honesty and fair dealing between
men about to embark in any lawful enterprise or
adventure, which involves relations of mutual trust
and confidence, either as partners or joint adventurers,
and that rule, which has and can have no exception,
rigidly requires the utmost good faith on the part of
each toward the other." See also Parsons Part. (4th
ed.) 192–193; Lindley Part. (8th ed.) 364; *Mitchell* v.
*Reed,* 61 N. Y. 123, 126; *Blisset* v. *Daniel,* 10 Haire,
493, 536; *Castle* v. *Marks,* 50 App. Div. 320; *Getty* v.
*Devlin,* 54 N. Y. 403, and authorities therein cited.

Upon the dissolution of a partnership by reason of the death of one of the members thereof it becomes the duty of the surviving partner to wind up the firm's affairs and to do so for the benefit of the partnership. Such a firm, although legally dissolved, continues for the purpose of collecting and distributing its assets and performing its antecedent obligations. The dissolution has respect only to the future, for as to everything past the partnership continues until all pre-existing matters are wound up. The survivors are neither deprived of the power to perform existing contracts on behalf of the firm nor relieved of the duty of having them performed. See *Kennedy* v. *Porter,* 109 N. Y. 526, 552; *Castle* v. *Marks, supra;* 30 Cyc. 661; *King* v. *Leighton,* 100 N. Y. 386. In the last mentioned case, Chief Judge Ruger used this language (p. 392): "After the dissolution by death or bankruptcy the solvent or surviving members become trustees of the assets for the purpose of winding up its affairs and distributing its effects, and they will not be allowed to reap a profit made by the use of the partnership assets after dissolution." Again (at p. 393): "In the case of *McClean* v. *Kennard* (L. R. 9 Ch. App. 336) it was held that upon the death of a member of a firm his estate was entitled to share in the profits of a contract unperformed at the time of death, and that those profits were to be actual profits ascertained when the contract was completed, and not by valuation or sale of the contract as of the time of death. Thus, as the result of an examination of the authorities, we are clearly of the opinion that upon the dissolution of a firm by the death or bankruptcy of one of its members it is the duty of the surviving or solvent members to take possession of the firm assets and perform its contracts, extinguish its liabilities and close up its busi-

ness, in the manner most advantageous to the interests
of all the parties concerned; that it is the right of the
representatives of a deceased or bankrupt partner
to share in the profits of all business unfinished
at the dissolution, but completed afterward, and
that a valuation of such business as of the
time of the dissolution will not be required
unless circumstances exempting the particular case
in equity from the operation of the general rules
exist (*Wedderburn* v. *Wedderburn,* 22 Beav. 84;
*Simpson* v. *Chapman,* 4 De Gex, M. & G. 154; *Case* v.
*Abeel, supra;* Collyer on Partnership, sec. 199; Par-
sons on Partnership, 505).'' In regard to the situa-
tion in this case, can it be said that Warren & Wetmore
have conducted themselves in accordance with the
rules laid down? Like the *Selwyn* case, the question
to my mind lies between the domain of law and that of
ethics. Nevertheless, I am constrained to hold that
the plaintiff and the Reed estate are entitled to an
accounting. A review of the evidence convinces me
that the conduct of Warren & Wetmore in taking over
the work of the Associated Architects for the benefit
of themselves was a breach of the trust incident to the
partnership relation. The funeral of Charles A. Reed
·was held at Scarsdale on November 15, 1911. The
defendant Wetmore and Mr. Newman, a former presi-
dent of the New York Central railroad, attended. On
the train coming to New York after the services were
over Wetmore and Newman had a talk regarding the
affairs of the Associated Architects. Newman asked
Wetmore how he was going to manage the situation,
and he replied that he didn't know and would have to
look into the matter. No suggestion was then made
by anybody as to any cancellation of the old contract,·
nor about the appointment of a new executive head to
succeed Mr. Reed, the railroad company having

reserved the right to make such appointment in case of a vacancy by resignation or otherwise. On the following day, however, without having consulted the plaintiff in this case and without his knowledge or consent, Wetmore wrote to the railroad company suggesting that a new contract was necessary because, as he claimed, the old contract was terminated. He enclosed a proposed contract which he said was intended to follow the form of the old one with the Associated Architects in all particulars, except that Warren & Wetmore were to be the architects. He suggested further that the old arrangement be terminated as of November 15, 1911; that accounts be settled as of that day, and that the new arrangements begin at that time. His letter also called attention to the fact that the railroad company had the right to terminate the agreement at any time. With this letter was enclosed a contract similar in all respects to the one under which the Associated Architects were then working, with the exception that the firm name of Warren & Wetmore was substituted for the old firm. This letter was written from the private office of Warren & Wetmore, and the copy thereof was made in Wetmore's private letter book. No record of it was ever made for or kept in the files of the Associated Architects. Stem claimed that he never knew of its existence until after bringing this action, and it is clear that no word was ever given to Stem or to the Reed estate prior to December 19, 1911, that Wetmore was seeking a contract with the railroad company for the individual benefit of his immediate firm. On that day the railroad company signed the contract substituting Warren & Wetmore as architects in the place of the Associated Architects. There is no evidence that Wetmore ever suggested to the railroad company that the old relations with the Associated Architects be con-

tinued until the unfinished business was completed or that the railroad company refused to accede to this. In fact it appears that Warren & Wetmore never even consulted Stem or the Reed estate as to the program that was to be adopted with regard to the railroad company. The superseding contract was signed December 19, 1911. By its terms the defendants were placed in a position where their individual interests were in conflict with their trust duties as surviving partners. The compensation for the terminal work was to be fixed upon the basis of the entire amount of work done. Hence the more that would be paid to the firm of the Associated Architects in the settlement of accounts the less would be paid to Warren & Wetmore on the final accounting, and *vice versa*. In addition, the recital of the superseding agreement shows the unfinished condition of the work which was in the hands of the Associated Architects. As stated in the agreement, the different phases or portions of the work were expected to arrive at different relative stages on December 31, 1911, when the new contract was to go into effect. After December 31, 1911, Warren & Wetmore continued in possession of the property, assets and executive force of the Associated Architects, using and enjoying them as they claimed for their exclusive benefit. It seems to me that the organization which the Associated Architects had built up was a partnership asset of which they would deprive the plaintiff and the Reed estate if they were not compelled to account for the profits which they had been able to make through its use. Not only were the offices of the Associated Architects used by Warren & Wetmore, but also the same books and records. The conclusion is irresistible that the cancellation of the old contract and the making of the new were brought about by the actions and attitude of Warren & Wet-

24

more and, in my opinion, they violated their legal obligation as surviving partners and should be required to account accordingly. In reaching this decision I am well within the authorities heretofore cited. In fact any other disposition of the case would be contrary to law. In *Castle* v. *Marks, supra,* a situation existed similar to the one presented here, and the Appellate Division of this department rendered its decision in favor of the plaintiff. There the plaintiff and defendant became partners. Their agreement fixed no time for the duration of the partnership. It was, therefore, terminable at will by either partner. The firm entered into two valuable contracts by which it became the exclusive selling agent of certain supplies. Thereafter the defendant terminated the copartnership by a notice to his partner. The following day he notified the companies holding the two contracts that the partnership was dissolved, and arranged a meeting with them. At this meeting the firm contracts were surrendered, and in place thereof each company entered into a contract with the defendant personally, the terms and conditions of which were substantially the same as those embodied in the prior contracts. The surrender of the contracts with the partnership was made without the knowledge or consent of the plaintiff, the defendant having acted for the purpose of procuring the contracts for his individual benefit. In deciding the case the Appellate Division did not dispute the proposition advanced by the learned justice at Trial Term that since the contracts were for personal service of both partners the two companies had the right to cancel the contracts upon the dissolution of the partnership; nevertheless, the decision was to the effect that while the defendant was within his rights in terminating the partnership, this could only be effectual so far as future contracts were concerned,

and the defendant was required to account. In principle the *Castle* case is almost identical with the case at bar. In each there is the outside contracting party having the right to cancel the contract because of the nature of the services to be performed; assuming as claimed by the defendants, that the association agreement was terminable at will. In both cases there is a substitution of the partnership suggested and brought about through the activity of one of the partners anxious to secure for his own interest the profits which would otherwise have accrued to the firm as proceeds of an unfulfilled contract. There is also the fact in each case of the outside party dealing with the partner in a superseding contract, thus indicating a willingness to continue dealing with the firm despite the right of that outside party to withdraw on account of the loss of one of the partners. It is not necessary here to go into the details of the accounting. The extent thereof must be controlled by what was reasonably to be considered as unfinished business of the Associated Architects on December 31, 1911, when that firm was discontinued. If the railroad company had decided to leave in the hands of the Associated Architects the matters in connection with which they had rendered substantial services, and, if it had made arrangements with other architects for any new business that might be decided upon, the result of this division would constitute a proper standard for determining what was new and what was unfinished business. Buildings authorized and in the course of construction fall within the proposed accounting. These include the main station, together with the bridge over Forty-second street, power house and boilers for terminal building and future buildings, Depew place extension, westerly extension of substation No. 1, ice storage plant, the temporary facilities for handling passengers on the

east and west side of the station, and also for the supply of heat, light and power, steel in streets, etc., signal cabins, American and Adams Express buildings, battery house at Fiftieth street, the incoming station, the electric zone stations at Ludlow, Glenwood, Ossining, Mount Vernon, Hartsdale, Scarsdale, White Plains, Fordham, Merchants Loft Building, bank accounts, money on hand, office equipment and supplies and the Young Men's Christian Association building. I am also of opinion that the Hotel Biltmore should be included in the accounting. The defendants contend that prior to Mr. Reed's death no work had been done on the Biltmore by the Associated Architects, and that Warren & Wetmore are responsible for the plans of the hotel. The defendant Wetmore, when questioned upon the trial about the work which the Associated Architects did on the hotel proposition prior to Mr. Reed's death, denied that the same people who had been interested and actively engaged in that work continued in the prosecution and development of the negotiations and transactions which led up to the present building. It is defendants' claim that prior to Mr. Reed's death there was a total abandonment by Bauman, the proposed lessee of the hotel, of his negotiations relative to the Biltmore, and that a new transaction on a new basis was taken up after Reed's death. The contention and claims of the defendants are not borne out by the evidence. While it is true that there was some halt in the negotiations at the time of Mr. Reed's death, nevertheless bringing the " warring factions " together shortly thereafter did not prove to be a serious matter. One of the persons who was largely instrumental in doing this was Schultze, an employee of the Associated Architects. Whatever he did, therefore, was necessarily done for the benefit of his employers and not for Warren & Wet-

more. Furthermore, the correspondence in relation to the Biltmore when chronologically read clearly refutes the position taken by the defendants. The evidence shows that the Associated Architects were only engaged at first in assisting Burnham & Co., Bauman's architects, in placing the proposed hotel so as not to interfere with the use of the underlying tracks. This part in the development of the hotel plans was rapidly outgrown, however, by the Associated Architects, and finally they were drawing floor plans for the building, etc., and taking the role of the chief architects for the structure. They were, practically speaking, in this position when Reed died, and after his death many of the essential ideas which the Associated Architects advanced were incorporated into the final working plans of Warren & Wetmore. Even Wetmore himself admitted upon the stand that the plans of the Associated Architects were used in making the final plans for the hotel for the purpose of ascertaining '' what to avoid in the new plans.'' The undisputed testimony shows that from the spring of 1910 to the end of the year 1911 the Associated Architects devoted a considerable amount of time and attention to the planning and other preliminary work necessary in connection with the scheme to erect a large hotel building over and upon the proposed incoming station so that the two might be operated together to their mutual advantage. Furthermore, the payments made by the railroad company to the Associated Architects in settlement of their claim did not include any compensation for services rendered for the preliminary work on the hotel proposition. It cannot be questioned that an important asset of the Associated Architects upon Mr. Reed's death was their reasonable expectation of being formally chosen as the architects for the hotel **building, thus securing** compensation and profits for

the work already done and to be done. In view of the facts presented it seems to me that if the surviving partners had all striven to procure this work for the Associated Architects the probabilities are that the work would have been given to them. They were in on the ground floor, so to speak, had made innumerable plans in connection therewith, were familiar with the problems of financing the project, and had the organization with which to carry on the transaction to a successful conclusion without delay and confusion. Instead of doing this Warren & Wetmore stepped into the situation, competed for the business of which they were trustees, and took for their immediate firm not only the financial reward which it was their duty to take for the Associated Architects, but also to a large extent the credit for the masterful work of their deceased partner, Reed, who undoubtedly supplied many of the fundamental plans for building the wonderful hotel structure. Furthermore, the evidence discloses that the Biltmore as completed conformed substantially to the preliminary plans prepared by the Associated Architects prior to December 31, 1911. It is true that there are some changes, but most of the basic features remain unaltered. It was testified to upon the trial in this connection that it frequently happens that in designing buildings of the general character of the Biltmore there are substantial differences between the preliminary plans as tentatively approved by the owner and the working drawings as developed for the building. Before October 8, 1911, Stem had been informed that in all probability the other architects, who were working in conjunction with the Associated Architects, but who represented the prospective lessee of the hotel, were out of the deal so far as being the chief architects for the hotel were concerned. On December 13, 1911, while the Associated

Architects were still carrying on the terminal work, Mr. Newman presented to the board of directors of the railroad company the proposition for building the hotel in accordance with the plans prepared by the architects for the railroad, the hotel to cost approximately $5,500,000. On December 22, 1911, the lessee of the hotel formed his corporation for the purpose of completing his end of the transaction. It would seem, therefore, that the parties to the hotel agreement were satisfied as to the essential features and plans for the new hotel before Warren & Wetmore took over the terminal work. It is hard to escape the conclusion that the final plans for the hotel were arrived at through the process of development and elimination and that the original ideas and essential elements of the proposition were largely conceived and executed through the work of the Associated Architects. The question also arises as to whether or not the defendants are entitled to compensation for completing the work of the firm. Under the authorities no such compensation is allowed unless there is some special circumstance requiring that an allowance be made in the exercise of equitable principles. The partnership relation carries with it the obligation to complete unfinished business and account to the representatives of the deceased partner. The partner is, therefore, entitled to no special compensation for doing only what he was fairly bound to do and what would have been imposed upon the others had the order of their death been different. It is urged also that the defendants unfairly delayed the collection of the amount concededly due from the railroad company, thereby causing serious loss in the way of interest, and that after the collection of this amount they unfairly declined to co-operate in a safe investment of the firm's money to the best advantage. It seems to me that there is con-

siderable force in the first contention.  The railroad company had in its possession ready for payment to the Associated Architects on November 29, 1912, two vouchers aggregating $210,587.60, against which it had an undisputed offset of $7,354.36, leaving a balance due of $203,233.24.  It appears, however, that Warren & Wetmore caused the payment of this sum to be deferred until July 8, 1913, because Mr. Wetmore was unwilling to have the matter closed up with the railroad company until some agreement had been reached between Warren & Wetmore and the representatives of Reed & Stem as to the adjustment of the affairs of the Associated Architects.  On July 8, 1913, Warren & Wetmore acceded to plaintiff's request that the money be deposited to the account of the Associated Architects, and the money was then accordingly collected and deposited.  I do not see the justice of defendants' conduct in permitting the railroad company to hold this large sum of money for so long a time at a dead loss of interest to the Associated Architects.  Concededly the money was due, and the reason advanced by defendants for deferring its payment does not appeal to me as being sound.  In fact it is insufficient upon its face, and the defendants should be required to account therefor, at least at the interest rate of two per cent. I am inclined, however, to hold that the exigencies of the case did not require the consent of the defendants to make an investment of the fund.  Viewed in the light of subsequent events, that course would have been wise and proper.  However, such an investment as the plaintiff claims should have been made would have tied the fund up at least to a certain degree, and I think, under all the circumstances, the defendants were not legally bound to give their consent.

Ordered accordingly.