**STATE AUTOMOBILE AND CASUAL-TY UNDERWRITERS, Plaintiff,**

v.

**Calvin C. JOHNSON and Patty Rose Johnson, Defendants–Appellants,**

**and**

**Rudi Basecke and Loretta Basecke, Defendants–Respondents.**

**No. 15723.**

Missouri Court of Appeals, Southern District, Division One.

Feb. 16, 1989.

J.D. Baker, Baker & Dull, Osceola, for defendants-appellants.

Craig Oliver, Mark A. Powell, Miller & Sanford, Springfield, for defendants-respondents.

CROW, Presiding Judge.

The primary dispute in this case is a quarrel between Calvin C. Johnson ("Calvin") and Patty Rose Johnson ("Patty") on the one hand, and Rudi Ewing Basecke ("Rudi") and Loretta Basecke ("Loretta") on the other, over proceeds of insurance policy number CC–20429 ("the policy") issued by State Automobile and Casualty Underwriters ("State Automobile"). The policy, among other coverages, insured a building against loss by fire in the amount of $225,000, and insured the furniture and fixtures therein against loss by fire in the amount of $25,000.

A fire destroyed the building and its contents. At the time that occurred ownership of the land on which the building sat was vested in "Calvin ... and Patty ..., husband and wife by the entirety, and Rudi ... and Loretta ..., husband and wife by the entirety." The named insureds on the policy, however, were Calvin and Patty, alone.

Calvin and Patty asserted they were entitled to all insurance proceeds. State Automobile commenced the instant action by a

petition praying that the Johnsons and the Baseckes be required to interplead so the trial court could determine entitlement to the proceeds. A nonjury trial produced a judgment awarding the Baseckes part of the proceeds and resolving other issues between the Johnsons and the Baseckes. The Johnsons appeal.

The building was erected in 1947 by W.O. Basecke and his wife, Edna, who, at that time, owned the land on which it was built. The building housed Stockton Cheese Company, founded by W.O. and Edna that year. They owned and operated the business until 1965, during which time they put additions on the building and purchased all equipment used in the business.

Patty and Rudi are offspring of W.O. and Edna. Rudi, so he testified, worked at Stockton Cheese Company practically all his life. Calvin, according to Edna, began working at Stockton Cheese Company in 1950.

In 1965 W.O. Basecke retired, and he and Edna turned the operation of the business over to Rudi and Calvin, who ran it thereafter as a partnership on a "fifty/fifty basis." W.O. and Edna, however, retained ownership of the property.

This arrangement persisted until 1976 when W.O. and Edna, as grantors, executed a warranty deed conveying the property to the four grantees set forth in the second sentence of the second paragraph of this opinion. Simultaneously therewith W.O. and Edna gave those grantees the equipment and fixtures used in the business.

The partnership continued manufacturing and selling cheese until 1978. In that year the partnership ceased manufacturing cheese but continued to operate a cheese store on the premises.

Patty and Calvin testified that in March, 1979, they began manufacturing cheese on their own, calling the activity "Stockton Cheese Company, Manufacturing Division" to differentiate it from the cheese store. Asked how long he and Patty made cheese, Calvin replied, "A short time."

On January 31, 1981, Calvin and Patty, as first parties, and Rudi and Loretta, as second parties, signed a contract providing:

"WHEREAS the parties hereto own the Stockton Cheese Company and inventory therein, it is agreed that the parties hereto will inventory the contents of the building, and when the inventory is completed, first parties agree to buy the interest of second parties in the cheese sales division, except cheese and products that are not salable and first parties do not want; which cheese and products second parties agree to remove and dispose of.

It is further agreed that first parties shall have the building rent free for a period of one (1) year, from the 31st day of January, 1981, to the 31st day of January, 1982, with option to renew the lease for another year upon request of first parties, at a reasonable rental.

Should first parties lease the cheese manufacturing equipment during the term of this lease, second parties are to receive one-half (½) of the rental received therefrom.

It is further agreed that all major repairs on the building and equipment shall be paid by first and second parties half and half, and no major repairs shall be made without the consent of all parties to this contract. All minor repairs shall be at the expense of first parties.

Taxes on the building and equipment shall be paid by first and second parties half and half.

It is agreed that insurance premiums have been paid on the building up to about the middle of the year and thereafter first parties will pay insurance premiums during the term of their rental and obtain liability policy in connection therewith.

First parties, during the term of their rental, shall pay the electric bills, water bills and heating bills.

It is further agreed that after all standing bills and notes have been paid by Stockton Cheese Company, the balance of the account in the Sac River Valley Bank will be divided between first

parties and second parties half and half; and that the remaining trucks will be advertised and sold to the highest bidder and the money obtained therefrom will be divided between first parties and second parties half and half."

In regard to the trucks referred to in the contract, Rudi testified the partnership owned trucks for collecting milk used in manufacturing cheese.

Fire insurance on the building had been written by State Automobile as far back as June 1, 1979. Coverage was provided for 12–month periods. For the period from June 1, 1979, to June 1, 1980, the policy insured the building in the amount of $140,-000, and insured the furniture and fixtures in the amount of $50,000. The policy also provided $5,000 coverage for the cheese inventory and $10,000 coverage for loss of earnings. The named insureds were: "Calvin Johnson & Rudi Basecke DBA Stockton Cheese Co. Sales Division." Coverage in the same amounts was provided for the same named insureds for the ensuing 12–month period, June 1, 1980, to June 1, 1981.

For the period from June 1, 1981, to June 1, 1982, however, the named insureds on the policy were changed to: "Calvin & Patty Rose Johnson DBA Stockton Cheese Plant, Mfg. Div.," and the amount of coverage on the furniture and fixtures was decreased to $25,000. This was the first 12–month period following the contract of January 31, 1981, quoted above. All other coverages remained unchanged.

Thereafter, at a time not revealed by the evidence, the coverage on the cheese inventory was increased to $30,000. The policy stayed that way until June 1, 1984, when the coverage on the building was increased to $225,000. No further changes were made in the policy, and it was in force January 6 and 7, 1986, when the building and its contents were destroyed by fire.

During the pendency of this case in the trial court the parties stipulated that neither Rudi nor Loretta claimed any of the $30,000 coverage on the cheese inventory or any of the $10,000 coverage for loss of earnings, and that the full amounts of those respective coverages could be paid by State Automobile to Calvin and Patty. That was done, narrowing the dispute to the $225,000 coverage on the building and the $25,000 coverage on the furniture and fixtures. The sum of those coverages—$250,000—was paid into the registry of the trial court by State Automobile July 10, 1987.

The trial court ordered that $5,000 of the $250,000 be set aside pending a ruling on State Automobile's request for attorney fees. Noting that Rudi and Loretta, in their pleadings, claimed only half the coverage on the building and half the coverage on the furniture and fixtures, the trial court ordered that $122,500 (half the $245,-000 available for distribution) be disbursed to Calvin, Patty and their lawyer. The remaining $122,500, together with $5,000 set aside pending determination of State Automobile's entitlement to attorney fees, was placed at interest by the circuit clerk.

Calvin and Patty, in their pleadings, sought not only the funds remaining on deposit, but also (1) partition of the land where the building had sat, (2) partition of a multitude of items of personal property in which Calvin and Patty allegedly owned an undivided one-half interest and Rudi and Loretta allegedly owned an undivided one-half interest, and (3) judgment against Rudi and Loretta for $2,801.37 representing half the amount allegedly paid by Calvin and Patty on a debt to Sac River Valley Bank incurred by Calvin, Patty, Rudi and Loretta, and half the amount paid by Calvin and Patty for repairs on a gasoline service station allegedly operated by Calvin, Patty, Rudi and Loretta.

Rudi and Loretta, in their pleadings, sought not only the insurance proceeds held by the trial court, but also a dissolution of the partnership between Calvin and Rudi and an accounting of "all partnership matters in controversy."

Rudi testified that although he and Calvin operated Stockton Cheese Company as co-owners beginning in 1965, dividing assets and liabilities equally, they never had a written agreement until the contract of January 31, 1981. Rudi explained that the property deeded to him, Loretta, Calvin and

Patty by W.O. and Edna Basecke in 1976 included not only the cheese factory but also a restaurant and a gasoline service station. According to Rudi, he and Calvin subsequently purchased equipment for the cheese factory, paying for it by "a partnership check."

Asked why the partnership ceased making cheese in 1978, Rudi answered that the milk producers in Cedar County from whom the partnership had traditionally acquired milk had dropped out of business, compelling the partnership to run its trucks long distances to obtain milk. This ultimately became unprofitable so the partnership stopped making cheese but continued operating a cheese store. By the time the contract of January 31, 1981, was signed Rudi had gone to work for another employer. Rudi testified Calvin operated the cheese store from the time of the contract until the fire. Then, this:

"Q ... Mr. Basecke, with regard to the buying out of inventory, did that buying out completely occur?

A No. It's still not been settled.

Q Okay. And what does Mr. Johnson—or what hasn't been settled with regard to the inventory?

A He still owes me for some of the cheese product.

Q And how much does he owe you?

A Three thousand eight hundred and fifty dollars."

Explaining how he arrived at that figure, Rudi recounted that the inventory totaled $31,852. He then itemized sundry payments and credits which, according to him, left $3,850 unpaid.

Rudi conceded he never demanded rent from Calvin after expiration of the one-year rent free period in the contract. Rudi added:

"I would try to see Calvin and he would always avoid me. He would be at the gas station and just a number of times I would drive in and walk in the front door and he would immediately leave out the side door and he was never at the cheese factory where I could catch him at the cheese factory."

On the subject of insurance Rudi's testimony included this:

"Q Now, during the period 1981 to 1986 did Mr. or Mrs. Johnson ever tell you that they were not insuring you and Mrs. Basecke on the building and contents of the Stockton Cheese Company?

A No, they didn't. Calvin had always —he'd always—I left him to take care of this end of the business and on our partnership business he'd always contacted the insurance man and I thought we was getting the best deal from whoever he was contacting. I trusted him with this.

. . . .

Q Do you know who the insurance was being carried with?

A We originally carried it with John Payne and then I understand later that he was incorporated with PMF–Thomison or joined this company.

Q Did you ever have any conversations with Mr. Payne about the insurance?

A I only seen John a couple of times and I would be working on the plant and I'd just maybe say hello. But Calvin took care of the insurance.

Q And what was the reason for that?

A I was busy operating the plant at that time. Calvin more or less looked after the office."

In regard to the restaurant included in the 1976 deed from W.O. and Edna Basecke to Calvin, Patty, Rudi and Loretta, Calvin testified they had rented it to third parties, the rent payments being deposited in the Stockton Cheese Company partnership account. According to Calvin, the restaurant was sold prior to the contract of January 31, 1981. Asked what was done with the sale proceeds, Calvin answered, "I think Rudi got his half and I got my half."

In regard to the gasoline service station included in the 1976 deed, Rudi testified it had been rented to sundry operators over the years. According to Rudi, the rent "was supposed to have been split fifty/fifty." Rudi explained that the partnership owed approximately $11,000 on a note to Sac River Valley Bank at time of trial. That debt, said Rudi, had been incurred

several years earlier on the inventory of the station.

Calvin identified a promissory note dated August 31, 1983, in the amount of $16,000, payable to Sac River Valley Bank, as "the note on the service station." At the foot of the note are the signatures "Calvin C. Johnson" and "Rudi Basecke." Calvin conceded he had signed both names. Above the signatures are the words: "Stockton Cheese Co. Service Sta." The word "Partner" follows Rudi's name. Calvin testified the note payments were $316.95 per month. He recounted that he and Rudi had endeavored to obtain enough rent from the operators to make the note payments. He confirmed Rudi's testimony that the unpaid principal balance on the note was "between ten and eleven thousand somewhere."

Rudi was asked what the partnership owned after the contract of January 31, 1981, was signed. He answered: "We still owned the cheese factory, all the equipment, the gas station. We was still co-owners on this." His testimony continued:

"Q And what was your understanding of the termination or winding up of the partnership?

A We had never wound up the partnership. We had tried to sell the factory but we couldn't get a buyer for it.

Q When did you think the partnership would come to an end?

A I had never really thought about this.... We still had depreciation on the factory and equipment. It wasn't making us any money but we still had a small amount of depreciation on this. This was mostly on the building."

Rudi recalled the partnership had filed a partnership tax return in 1965, and that the last partnership tax return had been filed in 1981.

John B. Payne of PMF/Thomison Insurors, Inc., testified he became "acting producer" on the Stockton Cheese Company insurance account in 1976. He explained that the $140,000 coverage on the building during the 12–month period from June 1, 1979, to June 1, 1980, was for the entire building, and that this was true for the period from June 1, 1980, to June 1, 1981.

Asked what happened in June, 1981, Payne responded that Calvin informed him that Rudi "was no longer involved in any of the Stockton Cheese operation and that we needed to change the insurance." As a result of that information Payne changed the named insureds on the policy to Calvin and Patty Rose Johnson doing business as Stockton Cheese Plant, Manufacturing Division. The coverage on the building remained at $140,000. Payne's testimony included this:

"[Q]: Was it your understanding that that was insurance on the entire building—

[A]: I don't know what anybody else thought, but I thought it was for the entire building.

[Q]: Were you ever told by Mr. Johnson that that insurance was for his one-half interest in the building?

[A]: Not that I can recall, no."

Explaining the increase in the coverage on the building effective June 1, 1984, Payne testified:

"... [I]t was at my suggestion. When I went up to deliver the renewal policy to Calvin Johnson I had a concern that we had, that the amount of coverage that we had on the building would not meet his co-insurance requirements, and in the event of a partial loss he could be penalized for lack of coverage. And so I was concerned, you know, that if we could we needed to increase the limits because he might suffer a co-insurance penalty.

So I am sure I discussed this with the Underwriting Department at State Auto and we came up with an actual cash value figure of 225,000 which would be replacement cost minus depreciation, and with ... the building being older, you know, we were able to get the value down to a reasonable amount, but it would put him within his co-insurance limits.

[Q]: Now, let me ask you, that was insurance for the entire building, is that correct?

[A]: Yes.

[Q]: Did Mr. Johnson ever tell you that he was insuring only his one-half interest in the building?

[A]: No."

Payne explained that no notice was sent to Rudi or Loretta when the named insured was changed on the policy effective June 1, 1981, and that he did not talk to either of them about it.

Rudi testified he was never notified by the Johnsons or by Payne that his name had been removed as a named insured on the policy, and that he first learned of this when he contacted Payne after the fire. Rudi admitted he never paid any premiums for the policy after the contract of January 31, 1981. Asked why, he answered, "On account of my contract and also they owed me some money on the cheese inventory that had never been cleared up and I wanted to, you know, sit down with them and get this ironed out but I could never meet with them."

Calvin testified he paid all of the premiums for the policy between 1981 and the date of the fire. Calvin admitted that in March, 1986, he sold "a truck, delivery tanker" for $3,500, and that Rudi was entitled to half that sum.

Rudi testified that from June to October, 1986, he made five payments of $100 each on the note to Sac River Valley Bank. He produced checks substantiating this.

The trial court made comprehensive findings of fact and conclusions of law. Pertinent to the issues in this appeal the trial court found that in 1965 Calvin and Patty ("appellants") and Rudi and Loretta ("respondents") took over Stockton Cheese Company and operated it "on a 50/50 basis" with all assets and liabilities being split on an equal basis between the two couples. The trial court further found that the partnership bought equipment for the cheese plant and depreciated it as partnership property. Additionally, the trial court found that the gasoline service station was a part of the partnership, and that the two couples would take rent payments from the station and apply them to the note at Sac River Valley Bank.

During the active life of the partnership, said the trial court, Calvin made all arrangements for insurance on the building and equipment. Regarding the contract of January 31, 1981, the trial court found that after it was signed no rent for the building was ever paid to or demanded by respondents, and that the rent period in the contract was never renewed or extended past January 31, 1982.

The trial court found that from 1981 until the fire appellants operated the cheese store and paid all premiums on the policy, which was to cover the entire value of the building. The trial court rejected a contention by Calvin that he intended to insure only appellants' interest in the building.

The trial court determined that the partnership between appellants and respondents was not terminated by the signing of the contract of January 31, 1981. A partnership, ruled the trial court, is not terminated until the winding-up of the partnership affairs, and until that is done the partners occupy a position of trustees or fiduciaries. The trial court found that no final division had ever been made of partnership property or partnership debts. As the partnership affairs were never wound up, the partnership was never terminated; consequently, the building and the furniture and fixtures, according to the trial court, remained partnership property.

The trial court concluded that inasmuch as appellants changed the names of the insureds on the policy without notice to respondents, appellants breached their fiduciary duty as partners to respondents. As a result, said the trial court, half the insurance proceeds for the building and half the insurance proceeds for the furniture and fixtures should be impressed with a constructive trust in favor of respondents.

Regarding the other issues between the parties, the trial court granted appellants' prayer for partition of (a) the land owned by appellants and respondents, and (b) the personal property owned by them. The trial court also allowed State Automobile $5,000 for its attorney fees, to be paid by

the $5,000 earmarked for such purpose in the registry of the trial court. No complaint is made in this appeal about the rulings set forth in this paragraph.

The trial court denied appellants' claim against respondents for $2,801.37, allegedly half the amount paid by appellants on the debt owed Sac River Valley Bank by appellants and respondents and half the amount allegedly paid by appellants for repairs on the gasoline service station.

As to the accounting requested by respondents, the trial court found that appellants were entitled to reimbursement by respondents in the amount of $9,541.04, representing half the insurance premiums paid by appellants on the policy after January 31, 1981. Appellants, as we read their brief, do not question the correctness of the $9,541.04 figure.

The trial court also determined that respondents were entitled to the following sums from appellants: (1) $1,750, being half the proceeds from the sale of the delivery tanker by Calvin in March, 1986, (2) $3,850, being the balance due respondents from appellants for the purchase of respondents' interest in the cheese inventory per the contract of January 31, 1981, and (3) $250, being half the note payments made by respondents to Sac River Valley Bank from June to October, 1986. The total of the amounts in this paragraph is $5,850.

Having reached those conclusions the trial court ordered the circuit clerk to disburse the impounded $127,500 as follows:

$127,500.00

| | |
|---|---|
| —5,000.00 | to State Automobile |

$122,500.00

| | |
|---|---|
| —3,691.04 | to appellants, being the difference between the $9,541.04 due appellants from respondents and the $5,850.00 due respondents from appellants |

$118,808.96    to respondents

Appellants' brief presents seven assignments of error; the first five pertain to the insurance proceeds. Appellants' first point is:

"The trial court erred in finding that a partnership and a fiduciary relationship existed, on the date of the fire, between the appellants and the respondents to operate the Stockton Cheese Company as a partnership, as there was no competent or substantial evidence to support that finding and establish an association between the appellants and respondents to carry on as co-owners a business for profit; and, that finding is against the overwhelming weight of the evidence."

The import of the point, as we divine it from the argument portion of the brief, is that the partnership between appellants and respondents ceased to exist in 1981. In support of that hypothesis appellants point out that in Missouri a partnership is an association of two or more persons to carry on as co-owners a business for profit. § 358.060.1, RSMo 1986. The primary basis of a partnership is the intention of two or more persons, manifested by a contract, to become partners by contributing money, effects and skill to a lawful business in the conduct of which each shall not only act for himself but as agent of all, and wherein each shares in the profits and losses. *Schneider v. Newmark*, 359 Mo. 955, 224 S.W.2d 968, 971[2] (1949); *Wills v. Wills*, 750 S.W.2d 567, 574[4] (Mo.App. 1988).

Appellants emphasize that the evidence demonstrated they and respondents terminated their business relations concerning cheese production and sales in 1981, that the business was thereafter conducted solely by appellants while Rudi was engaged in outside employment, and that 1981 was the last year a partnership income tax return was filed for the business. Additionally, argue appellants, the contract of January 31, 1981, provided that appellants were to buy the interest of respondents in the cheese sales division, that appellants were to occupy the building rent free for a year with option to renew at a reasonable rental, that the trucks owned by the partnership were to be sold and the proceeds divided equally, and that after payment of partner-

ship obligations the balance of the partnership bank account was to be divided equally. Calvin testified Rudi closed the partnership bank account and asked appellants to get "a new tax number." Patty testified appellants obtained the new number. These actions, say appellants, "obviously indicate an intention to cease operations as a partnership and terminate [the] partnership relationship."

Appellants concede they and respondents were still "co-owners of the property and equipment after 1981," but maintain the two couples were not partners engaged in the cheese business for profit. Appellants insist joint ownership of the property did not establish a partnership. Consequently, according to appellants, the trial court's finding that a partnership was in existence between appellants and respondents when the fire occurred is not supported by competent and substantial evidence. Absent the existence of a partnership, say appellants, no fiduciary relationship existed between the parties when the building and its contents burned.

Appellants' argument ignores the difference between dissolution of a partnership and termination of a partnership. Section 358.290, RSMo 1986, provides: "The 'dissolution' of a partnership is the change in the relation of the partners caused by any partner ceasing to be associated in the carrying on as distinguished from the winding up of the business." Section 358.300, RSMo 1986, provides: "On dissolution the partnership is not terminated but continues until the winding up of partnership affairs is completed." The term "winding up" means the administration of the assets for the purpose of terminating the business and discharging the obligations of the partnership to its members. *Smith v. Kennebeck*, 502 S.W.2d 290, 293[1] (Mo.1973). Even though a partnership is dissolved, it has a continued existence until its assets are collected and distributed to creditors and the winding-up of partnership affairs is completed. *Hogan v. Krohn*, 318 S.W.2d 163, 168 (Mo.1958).

It is thus evident that even though appellants and respondents stopped conducting the business of Stockton Cheese Company as co-owners in 1981, their partnership did not immediately end, but continued to exist by virtue of § 358.300 quoted above, pending the winding-up of the partnership affairs. *Schoeller v. Schoeller*, 465 S.W.2d 648, 654[7] (Mo.App.1971). Appellants' first point is without merit.

Appellants' second point is:

"Alternatively, the trial court erred in finding that the partnership between the appellants and the respondents had not been terminated and the affairs of the partnership had not been wound up on the date of the fire in January of 1986 because (1) the court has erroneously [sic] applied the law relating to the wind up of partnership affairs to the facts in the above subject case; (2) that finding is not supported by competent and substantial evidence; (3) that finding is against the greater weight of the evidence; and, (4) there was competent and substantial evidence that the affairs of the partnership had been wound up resulting in a termination of the partnership and the fiduciary relationship of the parties."

In support of this point appellants assert the contract of January 31, 1981, was an agreement to wind up the partnership affairs and terminate the partnership. Appellants insist the partnership affairs were wound up in 1981 when they bought out respondents' interest in the cheese inventory and "leased the co-owned property." According to appellants the segment of the contract providing for the lease of the building and equipment indicated an intention by the parties that it was unnecessary to sell the co-owned property to wind up the partnership affairs. Furthermore, say appellants, the building and fixtures did not constitute partnership property, and the trial court erred in holding otherwise.

Appellants also emphasize that according to Patty's testimony respondents were paid in full by December, 1982, for their interest in the cheese inventory purchased by appellants per the contract of January 31, 1981. Appellants assert respondents did not claim they were owed any additional money on that transaction until the dispute arose

over the insurance proceeds. From the above evidence, say appellants, it is clear that the partnership affairs had been wound up long before 1986.

Our review in this judge-tried case is governed by *Murphy v. Carron*, 536 S.W. 2d 30, 32[1] (Mo. banc 1976). The judgment will be sustained unless there is no substantial evidence to support it, unless it is against the weight of the evidence, unless it erroneously declares the law, or unless it erroneously applies the law. In determining the sufficiency of the evidence we are mindful that the trial court determined the credibility of the witnesses, and could accept or reject all, part or none of the testimony. *Mills v. Cameron Mutual Insurance Co.*, 674 S.W.2d 244, 246–47[1] (Mo.App.1984); *Cusumano v. Outdoors Today, Inc.*, 608 S.W.2d 136, 139[4] (Mo. App.1980).

Calvin conceded, in his testimony, that a partnership consisting of appellants and respondents operated Stockton Cheese Company from 1967 until 1981. Patty acknowledged, in her testimony, that after 1981 all equipment used by the partnership was never "divided up." She also admitted that as late as 1986 Calvin sold the delivery tanker which was partnership property, and that respondents had not, as of the time of trial, received their share of those proceeds.

■ Section 358.080.1, RSMo 1986, provides: "All property originally brought into the partnership stock or subsequently acquired by purchase or otherwise, on account of the partnership is partnership property." The true method of determining whether, as between partners themselves, land standing in the names of individuals is to be treated as partnership property is to ascertain from the conduct of the parties and their course of dealing the understanding and intention of the partners themselves, which, when ascertained, unquestionably should control. *Hudson v. French*, 211 Mo.App. 175, 241 S.W. 443, 446[5] (1922). In *Gates Rubber Co. v. Williford*, 530 S.W.2d 11 (Mo.App.1975), a tract of land was conveyed to two of the four members of a partnership. One of the two grantees advanced a portion of the down payment but was reimbursed by the partnership. The partnership provided the balance of the down payment. Payments on the loan that supplied the rest of the purchase price were made from partnership funds. The partnership paid taxes on the property and premiums for insurance on the property from partnership funds. The property was carried as an asset on the partnership books and was depreciated on the partnership income tax returns. Two of the four partners each claimed a one-fourth interest in the land and named the other two partners as owners of the other interests. On this evidence the appellate court held the trial court should have decreed that the land was partnership property. *Id.* at 15[9].

■ Patty testified Stockton Cheese Company was being operated by the partnership between appellants and respondents at the time W.O. and Edna Basecke deeded the real estate to appellants and respondents in 1976, and that the property was thereafter used in the partnership and continued to be property of the partnership throughout the time the partnership was in operation. Patty acknowledged that was also true of the equipment given appellants and respondents by W.O. and Edna. Calvin testified that at the time of the 1976 deed from W.O. and Edna, Stockton Cheese Company was being operated by a partnership consisting of appellants and respondents. Calvin admitted that from 1976 until 1981 the building and equipment were used in the partnership business and for no other purpose.

Rudi, as noted earlier, testified that after 1976 he and Calvin purchased equipment for the business and paid for it with a partnership check. Rudi added that the equipment was depreciated "through Calvin Johnson and myself as co-owners." Calvin admitted that after 1976 equipment for making cheese was purchased out of the Stockton Cheese Company account.

Furthermore, it is inferable that between 1976 and 1981 premiums for insurance on the building were paid by partnership funds. The named insureds on the policy

from June 1, 1979, to June 1, 1981, were, as noted earlier, "Calvin Johnson & Rudi Basecke DBA Stockton Cheese Co. Sales Division." Finally, appellants, in seeking reimbursement from respondents for half the amount allegedly paid by appellants on the debt to Sac River Valley Bank, pled that the debt was incurred "for the service station operated by [appellants and respondents]." The station, it will be recalled, was, like the cheese factory, situated on the tract deeded to appellants and respondents in 1976 by W.O. and Edna Basecke.

We hold the trial court's finding that the building, furniture and fixtures destroyed by the fire constituted partnership property was supported by substantial evidence and was not against the weight of the evidence, and that in so finding the trial court neither erroneously declared nor erroneously applied the law.

In addition to the partnership real estate, furniture and fixtures, other matters remained unresolved between appellants and respondents in connection with the winding-up of the partnership at time of trial. Appellants, as noted above, claimed respondents owed them for half the payments made by appellants on the debt at Sac River Valley Bank. Appellants conceded respondents were owed $1,750 for the delivery tanker sold by Calvin in March, 1986, *after* the fire. Respondents asserted, and the trial court found, that appellants owed respondents $3,850 for the purchase of respondents' interest in the cheese inventory in 1981, and $250 for half the payments made by respondents to Sac River Valley Bank in 1986 *after* the fire.

■ The existence of a partnership is not terminated merely by delay in winding up its affairs after it is dissolved. In *Schoeller v. Schoeller,* 497 S.W.2d 860 (Mo.App. 1973), a partnership was dissolved April 2, 1962, but its affairs were not wound up until December 26, 1971, when a court accomplished the task. *Id.* at 867. The opinion in *Schoeller* explained: "The Uniform Partnership Law contemplates that dissolved partnerships may continue in business for a short, long or indefinite period of time, so long as the rights of creditors are

not jeopardized and so long as none of the partners insist on a winding up and final termination of the partnership business." *Id.* at 867[3]. The opinion added that during the years between dissolution and winding-up the partners who had remained occupied the position of trustees or fiduciaries to the partner who had withdrawn and were accountable to him. *Id.* at 868[5].

We hold the trial court's findings that no final division had ever been made of the partnership property or partnership debts, that the partnership affairs were never wound up, and that the partnership had not been terminated at the time of the fire are supported by substantial evidence and are not against the weight of the evidence, and that in making such findings the trial court neither erroneously declared nor erroneously applied the law. Appellants' second point is denied.

Appellants' third point asserts the trial court erred in impressing a constructive trust in favor of respondents on the disputed insurance proceeds in that there was no substantial evidence of breach of a promise by appellants to keep respondents' interest in the property insured, and no substantial evidence of breach of a fiduciary duty owed respondents by appellants to keep respondents' interest in the property insured. Appellants point out Rudi admitted at trial that after January 31, 1981, Calvin never said he was going to carry insurance for Rudi, and Rudi also admitted that appellants never agreed to increase the coverage for him. Additionally, say appellants, the contract of January 31, 1981, required them to maintain only liability insurance on the property, and the duty to do that expired January 31, 1982.

Appellants acknowledge Rudi testified he thought Calvin would carry insurance for him because Calvin had always taken the responsibility for keeping the premises insured. Appellants argue, however, that it defies credibility that Rudi would expect Calvin to pay thousands of dollars for insurance premiums over a five-year period when there was no agreement to do so, particularly where appellants refused to extend or renew the lease after January 31,

1982. Furthermore, say appellants, there was testimony by Calvin, Caroline Mears (appellants' daughter), and Lester Otto Johnson (appellants' son) that on one occasion Rudi told Calvin he (Calvin) was quite foolish for maintaining insurance, and that instead of paying insurance premiums he (Rudi) was going to put the money "on time." There was also testimony by one Broyles, who was leasing the gasoline station at the time of the fire, that Rudi said he had no insurance on the property.

Respondents answer appellants' third point by noting that the trial court was not obliged to believe the testimony referred to in the preceding paragraph. *Cockrum v. Cockrum*, 550 S.W.2d 202, 204–05[2] (Mo. App.1977). Respondents add that the imposition of a constructive trust on the disputed insurance proceeds did not hinge on the existence of an agreement by appellants to provide insurance for respondents' interest in the premises after January 31, 1981.

■ We have already seen that upon dissolution of a partnership the partners occupy the position of trustees or fiduciaries until the winding-up of the partnership affairs is completed. *Schoeller*, 497 S.W.2d at 868[5]; *Filbrun v. Ivers*, 92 Mo. 388, 4 S.W. 674, 676 (1887). The fiduciary obligations extend to the partnership property. *Smith v. Smith*, 183 S.W. 1126, 1126[2] (Mo.App.1916).

■ *Swon v. Huddleston*, 282 S.W.2d 18, 25 (Mo.1955), teaches that there are many definitions of a constructive trust and some confusion as to the constituent elements, that many cases say such a trust must be based on fraud, actual or constructive, and that some cases apparently proceed upon the theory of unjust enrichment or of an unfair or wrongful holding, without any proof of fraudulent intent. *Swon* also explains that if a fiduciary relationship exists between the alleged trustee and the beneficiary no proof of fraud is necessary in order to establish a constructive trust. *Id.* at 25[9]. This exception is based on the principle that a breach of the fiduciary relationship is, in itself, a constructive fraud. *Id.* at 26. Constructive fraud is sufficient to warrant imposition of a constructive trust. *White v. Mulvania*, 575 S.W.2d 184, 187[2] (Mo. banc 1978).

■ In *Cave v. Cave*, 593 S.W.2d 592, 597[16] (Mo.App.1979), the court said:

"A constructive trust does not arise as a result of an agreement ... of the parties, but is implied by law and is a method of the law of equity to rectify a situation where a party has been wrongfully deprived of some right, title or benefit in property as a result of ... violation of confidence by another."

In the instant case we have upheld the trial court's finding that the partnership between appellants and respondents had not been terminated at the time of the fire, and we have observed that as a result appellants and respondents were fiduciaries as between themselves in regard to the partnership property.

The trial court, as reported *supra*, found that appellants breached their fiduciary duty to respondents by having State Automobile drop Rudi from the policy as a named insured effective June 1, 1981, without notice to respondents. Breach of a fiduciary duty, as noted earlier, is a constructive fraud sufficient to support the imposition of a constructive trust. Absent imposition of a constructive trust in favor of respondents on the insurance proceeds held by the trial court, respondents' interest in the building, furniture and fixtures destroyed by the fire would be lost and appellants would collect the full coverage on partnership property in which they admittedly owned only a half interest.

While respondents were undoubtedly careless in failing to make sure whether their interest in the property was insured after January 31, 1981, it must be remembered that Patty and Rudi are sister and brother, that appellants and respondents had been partners in Stockton Cheese Company since 1965 and had owned the property since 1976, that Calvin had always taken care of the insurance, and that for five years after January 31, 1981, appellants had used the partnership property for their own purposes without paying respondents

anything. These circumstances, coupled with the fiduciary relationship imposed by law on appellants and respondents as partners, fully support the trial court's finding that appellants breached their fiduciary duty to respondents by having State Automobile drop Rudi as a named insured on the policy without notice to respondents, and the trial court's imposition of a constructive trust in favor of respondents on half the insurance proceeds for loss of the building, furniture and fixtures. Appellants' third point is denied.

■■ Appellants' fourth point attacks a finding by the trial court that appellants would be unjustly enriched if they were awarded all the insurance proceeds. Appellants argue they had an insurable interest in the property and could insure it to its full value and recover all the insurance proceeds even though they were "tenants in common with [r]espondents." The argument concedes the $225,000 coverage on the building represented its full value, not just the value of appellants' half interest. That was confirmed by the testimony of insurance agent Payne, *supra*.

Respondents point out that the building, furniture and fixtures were partnership property, that the $225,000 paid into court was indemnification for loss of the building, that the $25,000 paid into court was indemnification for loss of the furniture and fixtures, that appellants have received $122,500 of those proceeds representing their half interest in the destroyed partnership property, and that if appellants were awarded the remaining $122,500 they would be unjustly enriched with funds representing respondents' half interest in the destroyed partnership property.

Calvin conceded that had the property been sold prior to the fire at a price satisfactory to him, respondents would have been entitled to half the sale proceeds. That means, of course, that appellants would have been entitled to half—not all—of the sale proceeds. As the insurance money is indemnification for the destroyed partnership property, appellants and respondents have the same interest in the money as they had in the property. The

trial court correctly ruled that awarding all the insurance proceeds to appellants would unjustly enrich them. Appellants' fourth point is denied.

■■ Appellants' fifth point is:

"Alternatively, the trial court erred in imposing a constructive trust on the full amount of the insurance proceeds payable for the destruction of the cheese building and personal property because there was no substantial evidence of a promise or duty by the appellants to carry that amount of insurance."

Appellants argue they had no obligation to respondents to carry more insurance than the amounts in force at the time of the contract of January 31, 1981. Those amounts, as mentioned earlier, were $140,000 on the building and $50,000 on the furniture and fixtures. Appellants emphasize Rudi testified respondents never agreed to increase the coverage for him. Therefore, say appellants, the trial court should not have awarded respondents more than half the coverage that existed as of January 31, 1981.

As explained earlier the obligation to protect the partnership property arose from the fiduciary relationship between the parties, not from a promise or agreement. The $250,000 insurance proceeds paid into court were indemnification for loss of the building, furniture and fixtures, all partnership property. As respondents had an equal interest with appellants in the destroyed partnership property they were entitled to an equal share of the insurance proceeds. Appellants' fifth point is denied.

■■ Appellants' sixth point avers the trial court erred in ruling that appellants owed respondents $3,850 for the purchase of respondents' interest in the cheese inventory per the contract of January 31, 1981. Appellants remind us that Patty testified respondents had been fully paid, and she produced certain cancelled checks and a "summary sheet" in support of her testimony. Appellants add that inasmuch as respondents disavowed any claim to the $30,000 coverage on the cheese inventory,

it was inconsistent for them to maintain they had not been fully paid by appellants.

The point is without merit. The $30,000 coverage on the cheese inventory was for the cheese lost in the fire January 6 and 7, 1986. There is no showing that any of such cheese was on hand five years earlier when respondents sold appellants their (respondents') interest in the inventory. Indeed, it is inferable that all the cheese on hand at that time had long since been sold.

Rudi, as reported *supra*, testified appellants still owed respondents $3,850, and he explained how he arrived at that amount. Credibility of witnesses and the weight to be given their testimony was for the trial court, *Mills v. 1st National Bank of Mexico*, 661 S.W.2d 808, 810[1] (Mo.App.1983), and we may not substitute our judgment for that of the trial court on credibility issues, *Atkins v. Clark*, 644 S.W.2d 365, 369[5] (Mo.App.1982). The trial court was free to believe Rudi's testimony and disbelieve Patty's testimony. Appellants' sixth point is denied.

Appellants' seventh point avers the trial court erred in failing to award them $1,604.15 from respondents as reimbursement for payments made by appellants on the note to Sac River Valley Bank during the years 1984, 1985 and 1986. Calvin produced checks totaling $6,339.40 which he said represented those payments. Calvin admitted, however, he had received rent from the lessee of the station in 1985 totaling $3,131.10 which he did not divide with respondents. Deducting the rent from the note payments leaves $3,208.30, half of which is $1,604.15, the amount appellants say they should have been allowed.

The trial court, of course, was not required to accept Calvin's testimony as true. Additionally, Rudi testified the station had been rented since 1981 and that he had received none of the rent after 1983. The trial court could have believed Calvin's figures but could also have believed there was rent received by Calvin for years other than 1985 that was never shared with respondents, and therefore appellants had failed to demonstrate any sum was due them from respondents. Appellants' sev-

enth point is denied and the judgment is affirmed.

HOLSTEIN, C.J., and GREENE, J., concur.