Kennis LUTZ, Marsha Lutz, Loren Lutz and Marion Lutz d/b/a Elk Track Ranch and Sheriden Trails, and Elk Track, Inc., a Wyoming business corporation, Appellants (Defendants),

v.

Scott SCHMILLEN and Josephine Schmillen, Appellees (Plaintiffs).

No. 94–5.

Supreme Court of Wyoming.

July 18, 1995.

Rehearing Denied Aug. 16, 1995.

Lawrence B. Hartnett, Jackson, for appellants.

Andrew L. Breffeilh, Jackson, for appellees.

Before GOLDEN, C.J., and THOMAS, MACY, TAYLOR and LEHMAN, JJ.

MACY, Justice.

Appellants Kennis Lutz, Marsha Lutz, Loren Lutz, Marion Lutz, and Elk Track, Inc. appeal from the findings of fact, conclusions of law, and order for accounting and appointing master; from the district court's judgment; and from the master's final report which was adopted in the district court's judgment.

We affirm.

## Issues

Appellants present five issues for our review:

A. The trial court erred in finding that the Goosewing Ranch was an asset of the partnership.

B. In the alternative, assuming that the Goosewing Ranch is partnership property, the trial court erred in adopting the finding of the master that the appellees were entitled to one-half of the profits of the post dissolution sale of the Goosewing Ranch, rather than the right to elect to receive one-half of the profits, if any, derived from the use of the appellees' interest in the Goosewing Ranch in operation of the partnership business, in lieu of interest.

C. Assuming that the appellees are entitled to one-half of the post-dissolution profit from the sale of the Goosewing Ranch, the trial court erred in adopting the findings of the master as to the amount of such profit, as the master ignored the clear undisputed evidence regarding the liabilities of the partnership in determining the amount of any such profit.

D. The trial court erred in not finding that the value of the appellants' capital contributions to the partnership was $540,000.00 and by not requiring the master to determine the value of appellees' interest in the partnership on October 31, 1989.

E. The trial court erred in adopting the findings of the master that the amount of the capital contribution of the appellees was $270,000.00

## Facts

Loren Lutz and Marion Lutz, husband and wife, owned Elk Track Ranch, Inc. They formed that corporation when they acquired the title to the Elk Track Ranch located in Teton County.

At all times relevant to this appeal, another Wyoming corporation existed which was known as Elk Track Ranch Outfitters, Inc. and which conducted a hunting and outfitting business at the Elk Track Ranch. Loren owned fifty-one percent of the Elk Track Ranch Outfitters shares, and Kennis Lutz, Loren's and Marion's son, owned the remaining forty-nine percent of the corporation shares. Kennis had the authority to bind Loren, Elk Track Ranch, Inc., and Elk Track Ranch Outfitters, Inc. in the transaction with the Schmillens.

Scott Schmillen and Josephine Schmillen, husband and wife, met Kennis at a sports show in Anaheim, California, where Kennis was promoting the hunting business operated at the Elk Track Ranch. Thereafter, the Schmillens saw Kennis every year at the sports show, and they became friends.

Sometime in 1985, the Schmillens told the Lutzes that they might be interested in investing in some manner in the Elk Track Ranch operation. In January 1986, Loren and Kennis met with the Schmillens at the Schmillens' home in Long Beach, California. At that meeting, the parties more seriously discussed the possibility of the Schmillens becoming investors. The Schmillens said that they could not make an immediate commitment because Josephine had just accepted a new position at Dean Witter Reynolds and wanted to work in this position for the experience but that they could commit to moving to Wyoming in two years. Kennis wanted the Schmillens to give him a monetary commitment in the amount of $25,000, which the Schmillens agreed to do.

In July 1986, the Schmillens again met with the Lutzes. The parties agreed that the Schmillens would contribute $270,000 in return for one-half of the interest in five acres of the Elk Track Ranch along with various buildings located thereon, the total of which was valued at $540,000. Josephine drafted a document which contained the parties' agreement on the basis of their discussions at this meeting. Kennis and the Schmillens signed this document.

In May 1988, the Schmillens moved to Jackson. The parties agreed that, because of Josephine's experience with Dean Witter Reynolds, she would keep the books for the partnership. Kennis and Scott began to work at the Elk Track Ranch.

By September 1988, virtually all the money had been spent, and the improvements which the parties had planned for the Elk Track Ranch in order to make it operable had not been completed. At about this time, Loren learned that the Goosewing Ranch was for sale at a reduced price. The Goosewing Ranch was located about five miles from the Elk Track Ranch and was a fully operational facility. The parties thought that the acquisition of the Goosewing Ranch could help the economic situation at the Elk Track Ranch because they could use some of the income derived from the Goosewing Ranch to further improve the Elk Track Ranch.

The Schmillens and the Lutzes attempted to find investors to enable them to acquire the Goosewing Ranch. Kennis was ultimately successful in raising the money which was needed to buy the Goosewing Ranch. Kennis and Marsha closed on the Goosewing Ranch purchase in May 1989. Later that month, the Schmillens met with Loren and Kennis. Kennis proposed that they determine the value of the Schmillens' interest in the Elk Track Ranch and use that value to calculate their proportionate share of the combined value of the Elk Track Ranch and the Goosewing Ranch, which would result in the Schmillens having a smaller ownership interest in the combined properties. The Schmillens rejected this proposal.

Later that year, the Schmillens informed the Lutzes that they wanted to sell their interest to the remaining partners, but the parties could not agree on how their affairs should be settled. The Schmillens filed this lawsuit on December 29, 1989, and the Lutzes sold the Goosewing Ranch in April 1991.

After holding a bench trial, the district judge entered his findings of fact, conclusions of law, and an order for accounting and appointed a master. The district judge found that, even though "the agreement [did] not mention the word 'partnership[,'] ... the testimony at the trial [was] uncontroverted that the parties intended to form a partnership and did form a partnership." He determined what the parties' agreements were with respect to their partnership and ordered the master to wind up the partnership affairs. The master filed his final report on October 29, 1993, and the district judge simultaneously filed his judgment in which he adopted the master's final report in its entirety and granted a money judgment in favor of the Schmillens. This appeal followed.

### Standard of Review

In resolving the questions presented by the Lutzes, we must determine whether sufficient admissible evidence supported the findings made by the district court and the special master. We assume that the evidence in favor of the successful party is true. We leave out of consideration entirely the evidence presented by the unsuccessful party which conflicts with the successful party's evidence, and we afford every favorable inference to the successful party's evidence which may be reasonably and fairly drawn from that evidence. *Sannerud v. Brantz*, 879 P.2d 341, 344 (Wyo.1994). "The findings of a master, to the extent that the court adopts them, shall be considered as the findings of the court." W.R.C.P. 52(a).

In accordance with W.R.C.P. 52(a), this Court will not set aside a district court's findings of fact unless the findings are clearly erroneous. *Hopper v. All Pet Animal Clinic, Inc.*, 861 P.2d 531, 538 (Wyo. 1993). " 'A finding is "clearly erroneous" when[,] although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm

conviction that a mistake has been committed.'" *Id.* (quoting *United States v. United States Gypsum Co.*, 333 U.S. 364, 395, 68 S.Ct. 525, 542, 92 L.Ed. 746 (1948)). Stated alternatively: "[A] determination that a finding is against the great weight of the evidence means a finding will be set aside even if supported by substantial evidence." *Id. See also Samuel v. Zwerin*, 868 P.2d 265, 267 (Wyo.1994). We review a district court's conclusions of law *de novo* on appeal. *Hopper*, 861 P.2d at 538.

*McNeiley v. Ayres Jewelry Co.*, 886 P.2d 595, 597 (Wyo.1994).

### Status of Goosewing Ranch

The Lutzes contend that the district court erred by finding that the Goosewing Ranch was a partnership asset. The Schmillens argue that the Lutzes have failed to show that the district court's finding was clearly erroneous or contrary to the great weight of the evidence. We agree with the Schmillens.

■ Courts have generally found that, when they are deciding whether property is partnership property, they must determine the parties' intent. *King v. Evans*, 791 S.W.2d 531, 533 (Tex.Ct.App.1990); *Shumway v. Shumway*, 679 P.2d 1133, 1139 (Idaho 1984); *Gorger v. Gorger*, 276 Or. 267, 555 P.2d 1, 9 (1976). The courts may consider the partners' acts and course of conduct in determining the partners' intention with regard to specific property. *State Automobile and Casualty Underwriters v. Johnson*, 766 S.W.2d 113, 122 (Mo.Ct.App.1989); *Sneed v. Kanelos*, 150 Cal.App.2d 684, 310 P.2d 706, 709 (1957). The courts may also consider the use which has been made of the property. *In re Estate of Kruse*, 19 Wash.App. 242, 574 P.2d 744, 747 (1978). Finally, the courts can consider whether, at the time the property was acquired, the reason for the acquisition was to devote the property to partnership purposes. *Price v. McFee*, 196 Md. 443, 77 A.2d 11, 13 (1950).

"The courts universally recognize the fiduciary relationship of partners and impose on them obligations of the utmost good faith and integrity in their dealings with one another in partnership affairs." 59A AM.JUR.2D *Partnership* § 420 at 453 (1987). *See Claughton v. Johnson*, 47 Wyo. 447, 458–59, 38 P.2d 612 (1934); *Steeby v. Fial*, 765 P.2d 1081, 1083 (Colo.Ct.App.1988); *Hooper v. Yoder*, 737 P.2d 852, 859 (Colo.1987) (en banc); *see also* WYO.STAT. § 17–13–404(a) (1989) (repealed 1993).[1]

Each partner is the agent of the partnership as to all matters coming within the scope of the relationship. Each occupies a fiduciary relationship to the others in all matters pertaining to the partnership enterprise, and the utmost good faith is required of each in their relations with each other. In fact it has been said that "the authorities unanimously agree that there is scarcely any relation in life which calls for more absolute good faith than the relationship of partners." *Stem v. Warren*, 96 Misc. 362, 161 N.Y.S. 247.

*Claughton*, 47 Wyo. at 458–59, 38 P.2d 612 (some citations omitted).

■ When a partner acquires property contrary to his fiduciary duty, he is held to be a trustee of the property for the partnership's benefit. 47 Wyo. at 459, 38 P.2d 612; *Thomas v. Schmelzer*, 118 Idaho 353, 796 P.2d 1026, 1032–33 (1990); *see also* § 17–13–404(a). In *Claughton*, we held:

"A partner may not purchase, for his own benefit, property of any kind in which the partnership is interested, nor lease property when the firm is entitled to the benefit of such lease, nor secure a valuable contract for himself which it was his duty to procure for the firm. If he does, he holds in trust for the benefit of the partnership the property so purchased or leased or the contract he has obtained and must account to the firm for the profits of the transaction, unless it appears that the co-partner consented to the transaction."

47 Wyo. at 459, 38 P.2d 612 (quoting 47 C.J. 800). *See also Smith, Keller & Associates v.*

---

1. The partnership act which was in effect in Wyoming during the life of the partnership in this case, WYO.STAT. § 17–13–101 to –615 (1989), was repealed by 1993 WYO.SESS. LAWS ch. 194,

§ 2. Wyoming's current partnership act can be found at WYO.STAT. § 17–21–101 to –1003 (Supp. 1994).

*Dorr & Associates,* 875 P.2d 1258, 1266 (Wyo. 1994).

■ While it is acknowledged that the partnership relationship does not preclude a partner's procurement of realty interests in his own right and with his own funds, the partner can do so only as long as the partnership does not suffer any disadvantage and the partner who is making the purchase does not reap any individual advantage from his position as a partner. *Liggett v. Lester,* 237 Or. 52, 390 P.2d 351, 354 (1964); *In re Estate of Wilson,* 50 Wash.2d 840, 315 P.2d 287, 292 (1957).

■ When a partner obtains financing for the development of real property in the course of a plan which had been originally pursued by the partnership for the same purpose, excluding other partners from participating further in the originally intended project, the partner has intercepted a partnership opportunity in breach of his fiduciary duty to the partnership. *Wright v. Ogle,* 283 Or. 505, 584 P.2d 737, 740 (1978).

■ In accordance with the above articulated rules, we seek to determine whether sufficient admissible evidence supported the district court's finding that the Goosewing Ranch was partnership property. We are not persuaded by the Lutzes' argument that, since they acquired the financing and the title to the Goosewing Ranch, the ranch was their separate property rather than a partnership asset.

Josephine testified that her understanding of the relationship of the Goosewing Ranch to the partnership was as follows:

A. The Goosewing Ranch was a fully operational ranch that had several cabins and a main lodge, kitchen, et cetera, that was all turnkey, as you'll use the term. It means all ready and prepared for guests to show up. They needed no more improvements or changes to the property to accommodate guests.

And if we were to purchase that property it would be added to the assets of the partnership; we would use both pieces of property to enhance one another. One piece of property would serve one purpose. The Elk Track would be used for hunting

still because it had the outfitters license and so forth, and because Goosewing was a fully operational ranch, monies that were earned from that ranch could help cover debts for the Elk Track Ranch improvements and so forth.

Q. So it was your understanding that the Goosewing Ranch was going to be purchased as an asset of the partnership?

A. Yes.

. . . .

Q. Did [Kennis] ever transfer the title of Goosewing Ranch from Kennis and Marsha Lutz to your partnership?

A. No.

Q. Did you ask that he do so?

A. It was understood in the very beginning that this piece of property was to be an asset to our partnership.

Q. Okay. Now, did Kennis Lutz call you at home to tell you when he had purchased the Goosewing Ranch?

A. Yes, he did.

Q. What did he say?

A. He said, "I'm back in town. We're the proud or the new owners of Goosewing Ranch. Give me a call." And that was left on our answering machine.

Q. Did you ever do any promotions for the Goosewing Ranch?

A. Yes, I did.

Q. When was that?

A. It was in the January 1989 sports show in Anaheim, California.

Q. And what were you doing there?

A. We had set up a booth designated as Goosewing Ranch, and we had brochures and name and address slips for people that were interested in getting further information on the ranch so they could come up for the summer or winter season.

Q. And did you get name tags issued by the Anaheim sports show for that purpose?

A. Yes, we did.

Q. And what is Plaintiff's Exhibit 22?

A. These are the name tags that Scott Schmillen and myself wore designating

that we represented the Goosewing Ranch as an exhibitor.

While she was promoting the Goosewing Ranch at the sports show, Josephine met her former brother-in-law, John Wagner, who had been her long time friend. The Schmillens went to dinner with Wagner and asked him if he would be interested in becoming an investor in the Goosewing Ranch. Although he did not ultimately invest in the Goosewing Ranch venture, Wagner was interested at that point in time and traveled to Jackson where he met with Scott and Kennis, discussed the possibility of investing, and inspected the property. He subsequently had several conversations with Loren. When he was asked about the subject of those discussions, Wagner testified as follows:

A. Kennis indicated that he and Scott were interested in purchasing the Goosewing Ranch; that in order to do that they needed additional investors and asked me whether I would be interested in becoming a partner with them in a joint grouping, as it were, of Elk Track Ranch. I assumed they meant the dude ranch because that's what they were in partners with, and so—

The Lutzes acknowledge that "[t]he only thing that can be said with certainty is that the Lutz[e]s told the Schmillens that they would be a 'part' of the Goosewing Ranch if the Lutz[e]s were able to acquire it." The Lutzes further acknowledge that they intended "to acquire the Goosewing Ranch to combine it with the Elk Track Ranch in some fashion, in an attempt to salvage the partnership and protect the Schmillens['] investment."

Both the Lutzes and the Schmillens attempted to find investors for the Goosewing Ranch venture. They agreed that both the Goosewing Ranch and the Elk Track Ranch properties were necessary for the operations which they ultimately wanted to pursue. Their plan was for the properties to enhance one another: The Elk Track Ranch would be used in the hunting aspect of the business, and the Goosewing Ranch would be used for lodging and to generate money for improving the Elk Track Ranch. The fact that Kennis was ultimately successful in obtaining the financing is not important. He owed a fidu-

ciary duty to the Schmillens which prohibited him from retaining the benefits which were derived from the partnership without their knowledge and consent. The partnership originally pursued the plan to acquire the Goosewing Ranch in order to combine it with the existing partnership property. Kennis intercepted the partnership's opportunity when he obtained the financing and the title to the property, excluding the Schmillens in violation of his fiduciary duty to them.

We hold that the district court's finding that the Goosewing Ranch was a partnership asset was not clearly erroneous or contrary to the great weight of the evidence because sufficient admissible evidence supported that finding.

### Amount of Profits from Sale of Goosewing Ranch

■ The Lutzes claim that, even assuming that the Goosewing Ranch was partnership property, the district court erred in finding that the Schmillens were entitled to receive one-half of the profits from the post-dissolution sale of the Goosewing Ranch. They admit that the Schmillens had the right to receive either one-half of the profits derived from the use of the Schmillens' interest in the Goosewing Ranch for the operation of the partnership business or interest calculated on the Schmillens' share of the partnership from the date of its dissolution, but they argue that the post-dissolution gain on the sale of the Goosewing Ranch did not constitute post-dissolution profits in which the Schmillens would have the right to share. The Lutzes also dispute the amount which the master determined was the profit from the Goosewing Ranch sale. The Schmillens argue that the Lutzes have failed to show that the district court's findings were clearly erroneous or contrary to the great weight of the evidence. We agree with the Schmillens.

When any partner retires and the business is continued, the partner

may have the value of his interest at the date of dissolution ascertained, and shall receive as an ordinary creditor an amount equal to the value of his interest in the dissolved partnership with interest, or, at

his option ..., in lieu of interest, the profits attributable to the use of his right in the property of the dissolved partnership....

WYO.STAT. § 17–13–614 (1989) (repealed 1993). *See Weisbrod v. Ely,* 767 P.2d 171, 174 (Wyo.1989); *see also Smith, Keller & Associates,* 875 P.2d at 1264. The right to share in the profits exists until the final accounting has been made so that those who are continuing the business will work quickly to get the affairs settled among the partners. *Lange v. Bartlett,* 121 Wis.2d 599, 360 N.W.2d 702, 704 (1984).

The Lutzes assert that the Schmillens are not entitled to receive any of the profits which was derived from the Goosewing Ranch sale because that sale occurred after the date on which the partnership dissolved.[2] They maintain that the correct way to account for the Goosewing Ranch would be to determine the value of the Goosewing Ranch as of October 31, 1989, and then add any profits which were realized on the Schmillens' interest in the use of, but not the sale of, the Goosewing Ranch since the nature of the partnership business was not the purchase and sale of real property.

In making this argument, the Lutzes rely upon *Weisbrod.* In that case, the trial court found that no post-dissolution profits were attributable to Weisbrod's rights in the partnership property. 767 P.2d at 175. The facts of that case, however, are distinguishable from those in the case at bar. In *Weisbrod,* the partnership agreement provided that Ely, who owned eighty percent of the partnership interest, was to be the sole managing partner, conducting the day-to-day business, while Weisbrod's role was limited to sharing in the profits and losses. 767 P.2d at 173. The partners' initial contributions were used to acquire furniture, fixtures, and a truck for the business. 767 P.2d at 175. Since this business managed property, all the post-dissolution profits were the result of

Ely's personal skill and services, and none of the post-dissolution profits was attributable to Weisbrod's interest in the partnership property. *Id.*

Weisbrod's interest in the partnership property, however, was not ignored. Rather, the trial court accounted for it in determining Weisbrod's share in the partnership, and the trial court also gave Weisbrod the interest which had been calculated on the value of his share in the partnership. 767 P.2d at 173. Had the partnership assets been sold for a profit in that case, Weisbrod would have been entitled to receive his twenty percent interest in the profit. *See Swann v. Mitchell,* 435 So.2d 797, 799 (Fla.1983) (finding that it was proper to include the increment in the value of capital assets in determining profits); *see also King,* 791 S.W.2d at 535 (explaining that the election provision of the Texas Uniform Partnership Act was intended to give the noncontinuing partner the benefit of asset appreciation). In the case currently before us, the profits at issue were the result of an increase in the value of a partnership asset, specifically the Goosewing Ranch. The Schmillens were, therefore, entitled to share in those profits.[3]

The district court required the Lutzes to conduct a full and complete accounting of all partnership assets and transactions. The district court also required that this accounting be audited and verified. The Lutzes, however, did not provide an audited and verified accounting as was ordered by the district court. The Lutzes' accounting did not account for any of the real or personal assets of the partnership, nor did it result in a "bottom line" number as to the Schmillens' interest in the partnership. The Lutzes failed to provide either a valuation of the Schmillens' interest at the time of the partnership's dissolution or an accounting of the profits which were attributable to the Schmillens' interest after the partnership had been dissolved. The Schmillens, on the other

---

2. The district court found that the partnership dissolved on October 31, 1989. Kennis and Marsha sold the Goosewing Ranch in April 1991.

3. The Lutzes also argue that, under *Weisbrod,* compensation owed to Kennis and Marsha for the personal services which they had rendered in

operating the business should have been deducted from the amount of the profit attributable to the Schmillens. In reviewing the record, however, we do not detect any evidence which shows what this value might be. We, therefore, are unable to consider this argument.

hand, presented evidence with regard to the profits on the Goosewing Ranch sale by introducing evidence of the ranch's purchase price and its sale price.

The district court's findings were not clearly erroneous or contrary to the great weight of the evidence. Accepting the admissible evidence in favor of the Schmillens as being true, we hold that sufficient evidence supported the master's finding that "[e]ach party is entitled to the sum of $122,-631.50 for [his] share of the sale of the Goosewing Ranch." Since this gain was obtained after the partnership had been dissolved but before the Lutzes conducted the accounting and made a final distribution to the Schmillens, the master did not err in finding that the sale proceeds constituted post-dissolution profits.

### Amount of Each Party's Capital Contribution

■ The Lutzes claim that the district court erred in adopting the master's findings with regard to the amount of each party's initial capital contribution. The Schmillens argue that the parties orally agreed that, by virtue of their capital contributions, the Schmillens were entitled to have a fifty percent interest in the partnership and to share in fifty percent of the profits and the losses realized by the partnership.

WYO.STAT. § 17–13–401(a)(i) (1989) (repealed 1993), which was in effect during the existence of the partnership in this case, provided that, subject to any agreement among themselves, "[e]ach partner shall be repaid his contributions, whether by way of capital or advances to the partnership property and share equally in the profits." The courts will presume that the partners possess equal interests in the partnership unless the partners have an agreement to the contrary. *Shumway*, 679 P.2d at 1139; *Yarborough v. Kilbee*, 307 So.2d 223, 227 (Fla.Dist.Ct.App. 1975).

A determination of the partners' capital contributions had to be made before the partnership accounts could be settled after a dissolution occurred because the Uniform Partnership Act required that a partner's capital contributions had to be paid before

the profits could be divided. WYO.STAT. § 17–13–612(a)(ii) (1989) (repealed 1993).

The district court found that the parties had entered into a written contract. That contract provided in pertinent part:

Kennis & Marsha Lutz and Dr. Loren Lutz agree to sell 50% of Elk Track Ranch to Scott & Jo Schmillen.

The sale price will be $270,000.00 which will consist of five acres, buildings and business transactions on the property, excluding the new barn. Additional property may be purchased at a later date as financing dictates.

. . . .

If at the time the second and final payments are due, the payments cannot be met, Kennis Lutz and Dr. Loren Lutz may buy out Scott & Jo Schmillen or sell the remaining percentage at their discretion.

The Schmillens and Kennis Lutz signed this agreement.

The district court also found: "The parties orally agreed that by virtue of their capital contribution to the partnership, [the Schmillens] were entitled to a 50% interest in the partnership, and to share in 50% of the profits and 50% of the losses of the partnership."

After collecting two days' worth of evidence from the parties and relying on Wyoming's partnership act as well as the district court's findings which are outlined above, the master found that the parties' initial capital contributions were of equal value.

We will not substitute our judgment for that of the trier of fact. *PR (Parental Rights to TR) v. Shannon*, 777 P.2d 1106, 1111 (Wyo.1989). The Lutzes received their capital contribution of the Elk Track Ranch property, and the Schmillens should receive the amount which they contributed as capital. In analyzing the parties' written contract in addition to the trial testimony, we conclude that the parties intended for the Schmillens to acquire a fifty percent interest in the partnership. We hold, therefore, that sufficient admissible evidence supported the findings that the parties were equal partners and that their initial capital contributions were equal.

*Conclusion*

We have not found any reversible error in the issues raised by the appellants.

Affirmed.

GOLDEN, Chief Justice.

ORDER DENYING PETITION FOR REHEARING
AS UNTIMELY FILED

This matter came before the Court upon the appellants' petition for rehearing. A petition for rehearing must be filed within 15 days of the date on which the opinion is rendered. WYO.R.APP.P. 9.07. In this instance, the opinion was rendered on July 18, 1995. A petition for rehearing was, therefore, due not later than August 2, 1995. The petition for rehearing was filed on August 7, 1995. WYO.R.CIV.P. 6(d) does not apply in this circumstance. The petition for rehearing was not timely filed and the Court finds it should be denied for that reason. It is therefore,

**ORDERED** that the petition for rehearing be, and hereby is, denied for the reason that it was not timely filed.